**Royer Cooper Cohen Braunfeld LLC**
By:  Barry L. Cohen
     Matthew Faranda-Diedrich (*Pro Hac Vice application forthcoming*)
     Hope Steidle Kildea (*Pro Hac Vice application forthcoming*)
1120 Avenue of the Americas, 4th Floor
New York, NY 10036
T: 212.389.5947
F: 484.362.2630
Email: BCohen@rccblaw.com
       MFD@rccblaw.com
       HSteidleKildea@rccblaw.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LABYRINTH, INC. and HARBOR  BUSINESS COMPLIANCE CORPORATION, | : |
| | : |
| Plaintiffs, | : |
| | : |
| vs. | : **CASE No. 1:24-cv-5898** |
| | : |
| CANADIAN IMPERIAL BANK OF COMMERCE,: | **COMPLAINT** |
| | : |
| Defendant. | : |
| | : |

Plaintiffs, Labyrinth, Inc. ("Labyrinth") and Harbor Business Compliance Corporation ("Harbor Compliance" and, together with Labyrinth, "Plaintiffs"), by and through their undersigned attorneys, Royer Cooper Cohen Braunfeld LLC, file this Civil Action Complaint (this "Complaint") against Defendant, CANADIAN IMPERIAL BANK OF COMMERCE ("CIBC" or the "Bank")[1], and aver as follows:

## INTRODUCTION

1.      This Complaint involves the improper and bad faith conduct of a lender, CIBC, that has endured for the past two-plus years.

---

[1] Harbor Compliance, Labyrinth, and CIBC are each referred to herein as a "Party" and, collectively, as the "Parties."

2.      This action arises out of a loan transaction between CIBC and Plaintiffs, pursuant to which CIBC agreed to extend a term loan and a line of credit to Harbor Compliance and Labyrinth to finance, in part, Harbor Compliance's acquisition of all shares of Labyrinth.

3.      After the Parties finalized the loan in October of 2021, the commercial lending market changed drastically, with significantly higher interest rates, decreased business valuations, and, overall, greater reluctance on the part of lenders to make loans on terms as favorable as those originally agreed upon by the Parties.

4.      As market conditions grew less and less favorable to borrowers, and the terms of CIBC's arrangement with Plaintiffs became comparatively more favorable to Plaintiffs, CIBC endeavored to re-trade the terms of the Parties' existing arrangement.

5.      Instead of being upfront and honest with the Plaintiffs regarding these changed circumstances, CIBC embarked on a nefarious plan to forcibly exit Plaintiffs from the Bank by any means necessary.  This scheme culminated in CIBC calling the entire loan balance in 2023 despite the fact that Plaintiffs had made each and every principal and interest payment, in full. Using this cudgel, CIBC then coerced Plaintiffs into signing an amendment to the loan under duress that, among other things, extracted significant payments and shortened the loan's maturity date by more than two and a half years, from October 4, 2026 to March 31, 2024.  What is worse, CIBC endeavored to extract as much value from the account by charging a series of improper fees before pushing Harbor Compliance out the door.  The scheme culminated with CIBC holding up the required March 31, 2024 refinancing of the loan by demanding, as a condition of the refinance, that Plaintiffs pay for an outrageous amount of legal fees and costs – the very same legal fees and costs that the Bank had previously promised it would never seek from Plaintiffs.  Those promises were relied upon by Plaintiffs in agreeing to earlier pay, again under duress, a similarly outrageous

amount of legal fees and costs in connection with the amendment; effectively forcing Plaintiffs to subsidize the Bank's bad faith behavior.

6.      Plaintiffs bring this Complaint to end CIBC's outrageous conduct, once and for all.

## PARTIES

7.      Labyrinth is a corporation formed under the law of the State of Maryland, with its principal place of business located at 1395 Piccard Drive, Suite 180 Rockville, Maryland 20850.

8.      Harbor Compliance is a corporation formed under the law of the Commonwealth of Pennsylvania, with its principal place of business located at 1830 Colonial Village Lane, Lancaster, Pennsylvania 17601.

9.      Upon information and belief, CIBC is a banking corporation formed under the laws of Canada with its principal place of business located at 199 Bay Street, Commerce Court Toronto, Ontario, Canada M5L 1A2, and regularly conducts business in this State and District.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this Action pursuant to 28 U.S.C. § 1332(a) because: (i) Labyrinth is a corporate citizen of the State of Maryland, Harbor Compliance is a corporate citizen of the Commonwealth of Pennsylvania, and CIBC is a Canadian chartered bank such that Plaintiffs are completely diverse from CIBC; and (ii) in light of CIBC's conduct as set forth in this Complaint below, Plaintiffs seek in excess of $75,000 in damages, exclusive of interests and costs, in an amount to be fully determined at trial.

11.      This Court has personal jurisdiction over CIBC because, *inter alia*, CIBC consented to and waived any right to object to this Court's personal jurisdiction, as set forth in Section 11 of the Loan Agreement (as defined in this Complaint below) at the center of this dispute, which states, in pertinent part:

CHOICE OF LAW, VENUE AND JURY TRIAL WAIVER. Except as otherwise expressly provided in any of the Loan Documents, this Agreement and the other Loan Documents shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of law. **_Each Loan Party hereby submits to the exclusive jurisdiction of the State and Federal courts in New York County, City of New York, New York_**; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Bank from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favor of Bank. **_Each Loan Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each Loan Party hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court_**. Each Loan Party hereby waives personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified mail addressed to such Loan Party at the address set forth in, or subsequently provided by such Loan Party in accordance with, Section 10 and that service so made shall be deemed completed upon the earlier to occur of Loan Parties' actual receipt thereof or three days after deposit in the U.S. mails, proper postage prepaid. Each Loan Party hereby expressly waives any claim to assert that the laws of any other jurisdiction govern this Agreement.

12.     Venue is proper in this Judicial District pursuant to, *inter alia*, the Forum Selection Clause.

## FACTUAL BACKGROUND

13.     As William Shakespeare famously wrote, "what's past is prologue". The causes of action asserted in this Complaint, based on multiple breaches of contract, duress, coercion and failed promises that occurred in 2024, are the continuation of a long-running scheme by CIBC, which was first hatched by the Bank several years ago. Therefore, to understand and appreciate the present, a consideration of the past is needed.

14.     On May 29, 2021, Harbor Compliance was introduced to Charlie Kelly of CIBC as a potential lender for a commercial loan.

15.     Starting in or around June of 2021, Harbor Compliance began discussions with CIBC, and specifically Mr. Kelly, for the Bank to fund a majority of the purchase price of a company Harbor Compliance was looking to acquire, Labyrinth.

16.     As part of those discussions Harbor Compliance provided CIBC with data and information relative to the businesses of both Harbor Compliance and Labyrinth.  To that end, Harbor Compliance provided CIBC with revenue estimates and projections provided by the sole shareholder of Labyrinth (the "Seller").  Harbor Compliance also directly connected the Seller to representatives of CIBC so that the Bank could ask the Seller whatever other information the Bank deemed necessary or appropriate for their underwriting of the loan.

17.     The discussions between Harbor Compliance and CIBC ultimately resulted in the Parties executing that certain Loan and Security Agreement dated as of October 4, 2021 (the "Loan Agreement").

18.     Through the Loan Agreement CIBC agreed to provide Plaintiffs with (a) a revolving working capital credit facility (the "Revolving Credit Line"), and (b) a term loan facility (the "Term Loan").

19.     In the first WHEREAS clause, the Loan Agreement made clear that the proceeds of the Term loan "shall" be used "to fund a portion of the acquisition consideration" due pursuant to the Stock Purchase Agreement dated as of October 1, 2021 by and among Labyrinth, its sole owner (the Seller) and Harbor Compliance as buyer (the "Purchase Agreement").

20.     One of the express conditions precedent to closing on the Loan Agreement was that CIBC had received "in form and substance satisfactory to Bank" all of the "Closing Date Transaction Documents", defined to include, *inter alia*, the Purchase Agreement.

21.     Ultimately, on October 4, 2021 once the Bank: (i) had reviewed the Seller's estimates and projections; (ii) had access to the Seller for any other requests or diligence; and (iii) had reviewed the Closing Date Transaction Documents including the Purchase Agreement and found such documents satisfactory, the Bank closed on the Loan Agreement and funded the

Labyrinth acquisition despite not receiving several of the other stated conditions precedent to closing.

22.    For example, Section 3.1(l) of the Loan Agreement required that the Bank receive "evidence satisfactory to Bank that the Loan Parties [*i.e.* Harbor Compliance and Labyrinth] maintain Qualified Cash on the Closing Date after giving effect to the Closing Date Transactions of at least $1,500,000."  "Qualified Cash" was defined as cash or cash equivalents held in accounts at the Bank (or its affiliate), or if held at another institution the account must be subject to "Account Control Agreements" as defined in the Loan Agreement.  The Loan Parties had not maintained the stated amount of funds at CIBC as of the Closing Date and had not provided CIBC with any Account Control Agreements for accounts at outside institutions, but CIBC nonetheless closed over the condition precedent of Section 3.1(l).  Based on this, Plaintiffs reasonably understood that CIBC was waiving or otherwise modifying the closing condition set forth in Section 3.1(l).

23.    As of the Closing Date, the Bank was also aware that one of the key financial covenants in the Loan Agreement, the "Total Leverage Ratio" (set forth in Section 6.10(a) thereof) was incapable of being accurately calculated because the calculation was not fully defined and the covenant itself was set on an accrual method of accounting.  However, both businesses operated on a cash basis accounting method.  CIBC told Plaintiffs to not worry about this obvious flaw in the Loan Agreement and promised to work with Plaintiffs post-closing to more clearly define the Total Leverage Ratio requirement. In this way, CIBC induced the Plaintiffs to enter into the Loan Agreement with the full knowledge that the Plaintiffs would not be able to satisfy certain material conditions at the moment the loan closed.

24.     Pursuant to Section 6.6 of the Loan Agreement, starting immediately after the Loan Agreement was executed, the parties began negotiating terms of certain deposit Account Control Agreements for several of Plaintiffs' bank accounts at other institutions.

25.     Specifically, by October 14, 2021, CIBC had signed off on terms of a form of Account Control Agreement with Truist Financial Corporation ("Truist"), entitled "Restricted (Non-Blocked) Account Agreement" that pertained to multiple different Harbor Compliance accounts at Truist (the "Truist Account Agreement").

26.     By early January 2022, Charlie Kelly had departed CIBC and handed off Plaintiffs' account to Mark Usher, head of CIBC's Innovation Banking teams in the United States and Canada.

27.     On January 10, 2022, Mr. Usher emailed a response stating that he would be arranging for a call to introduce Plaintiffs to their "new senior coverage individual[s]" at CIBC. Those individuals ended up being Brittany Martin and Ryan Enriquez.

28.     In that same January 10, 2022, email Mr. Usher represented that "[r]est assured we [CIBC] have never been more committed to the sector" and that Plaintiffs "will be in good hand[s] going forward."  At no point in that email or in any follow-up communication prior to May 27, 2022 did Mr. Usher ever state a belief on behalf of the Bank that Plaintiffs were in default under any terms of the Loan Agreement.

29.     Despite being aware of multiple Truist accounts, at no time following October 14, 2021 through May of 2022, did Mr. Usher or anyone at CIBC ever demand or require that the Truist accounts be transferred to CIBC, or otherwise cite to a default under or violation of the Loan Agreement related to the multiple Truist accounts.

30.     Indeed, as late as May 2022, CIBC stated quite the opposite and was leading Plaintiffs to reasonably believe that not only its accounts at Truist, but *all of its external bank accounts* could be maintained at those institutions, provided that for each such account Plaintiffs provided a corresponding Account Control Agreement.

31.     For example, on May 2, 2022, Plaintiffs forwarded a draft Account Control Agreement for the bank account maintained at Pacific Premier Bank ("PPB") to the two CIBC senior coverage individuals, Mr. Enriquez and Ms. Martin.

32.     Rather than responding that the PPB account must immediately be moved to CIBC, or otherwise citing to a violation of the Loan Agreement, CIBC instead proceeded to have its external counsel review and revise the proposed Account Control Agreement.  Ms. Martin sent that markup back to Plaintiffs on May 6, 2022.

33.     All of these actions taken and representations made by CIBC must be viewed against the backdrop of Section 6.6 of the Loan Agreement.

34.     By its express terms, Section 6.6 sets forth two separate requirements.  The first requirement, set forth in subsection (a), was that the Loan Parties' then-existing "Collateral Accounts" (as defined in the Loan Agreement) as of the Closing Date of October 14, 2021 be maintained at CIBC or its affiliates within sixty date of the Closing Date, *i.e.* by no later than December 3, 2021.  The second requirement, set forth in subsection (b), provided for the Loan Parties to deliver Account Control Agreements for each of the Collateral Accounts held at outside institutions.

35.     By consistently pressing for only the second requirement of Account Control Agreements over external accounts rather than that those accounts be maintained at CIBC, the Bank indicated its understanding that subsections (a) and (b) of Section 6.6 could be read

harmoniously to expressly permit the maintenance of certain accounts at outside institutions, subject of course to delivery of Account Control Agreements.

36.     Indeed, throughout April and May 2022, Mr. Enriquez and Mr. Martin repeatedly represented to Harbor Compliance that the Company did not need to transfer all funds to CIBC. Rather, Mr. Enriquez simply requested that Harbor Compliance fund its CIBC account in the short-term to demonstrate to the Bank that the Company was transitioning its banking activity to CIBC.

37.     At a bare minimum, the actions by CIBC in acknowledging and accepting the continued existence of the outside accounts in the months following the December 3, 2021 alleged account transfer deadline and continuing at least through May 6, 2022 when they were negotiating terms of Account Control Agreements with no reference to moving accounts to the Bank operate as either a modification or waiver of any requirement arguably present in Section 6.6(a).  At the time, Plaintiffs relied upon the understanding that whatever the Bank's conduct was accurately described as legally, it was consistent with how the Bank had forgone compliance with the conditions precedent to closing of Section 3.1(l) and (m).

38.     Turning to the Total Leverage Ratio, in addition to being impossible to calculate accurately (as described above), the Total Leverage Ratio was also deeply flawed because the revenue estimates and projections provided by the Seller, upon which the Bank underwrote the Loan Agreement, were completely inaccurate.  Plaintiffs informed CIBC of these several material issues with the Total Leverage Ratio on or around April 28, 2022.

39.     Specifically as it pertained to the Seller, Plaintiffs informed CIBC that, although the underlying business was strong, the Total Leverage Ratio had been negatively affected by inaccurate revenue estimates projections for Labyrinth supplied by the Seller, upon which both CIBC and Plaintiffs fully relied at the time the Parties executed the Loan Agreement.  The

inaccurate revenue projections ultimately led to depressed revenues for the combined overall business and thus made the Total Leverage Ratio unachievable at least in the near term.

40.     After being made aware of these issues, CIBC's senior coverage individuals, and specifically Ms. Martin, verbally represented in late April 2022 that it would "work with" Plaintiffs to set revised terms.

41.     Ms. Martin further represented on May 4, 2022 that the bank was beginning a "waiver process" related to the Total Leverage Ratio.

42.     And then on May 9, 2022 Ms. Martin further represented that the process would include "set[ting] covenants appropriately for the remainder of the year."

43.     Ms. Martin had previously represented that CIBC would not initiate this "waiver process" until Harbor Compliance executed a compliance certificate, indicating that the Company was out of compliance with the Loan Agreement.  According to Ms. Martin, this compliance certificate was a necessary formality for CIBC to reset the Total Leverage Ratio covenants.

44.     Rather than using the compliance certificate as promised to reset the existing covenants, CIBC used the certificate against Harbor Compliance to renegotiate unrelated terms of the Loan Agreement. Harbor Compliance never would have executed such a document had they known CIBC's true intentions.

45.     Thus, by early May 2022 Plaintiffs understood and relied upon CIBC's representations that the Total Leverage Ratio requirement was being modified and/or waived, similar to how the Bank waived: (i) the closing condition requirements of Section 3.1(l); (ii) the closing condition requirements of Section 3.1(m); and (iii) any alleged requirements of Section 6.6(a).

46.     Consistent with the shared understanding of all Parties that the Loan Agreement was not in a state of default, between October 2021 and through May 2022, CIBC continuously invoiced Plaintiffs for regular principal and interest payments, only, under the Loan Agreement. During that timeframe CIBC did not seek to collect or make even so much as a reference to default interest in any of the invoices presented to Plaintiffs.  Plaintiffs timely and fully paid each monthly invoice, and CIBC applied those payments toward principal and interest, and not toward default interest.

47.     Nonetheless, in mid-May 2022, CIBC abruptly ceased communications regarding the "waiver process" and 2022 covenants.

48.     Then, on May 27, 2022, CIBC suddenly reversed course and sent Plaintiffs a "Notice of Events of Default and Reservation of Rights" (the "EOD Notice").

49.     As will be detailed below, CIBC's reversal was all part of a bad faith plan to cram down changes to several material terms of the Loan Agreement., though which CIBC would extract significant amounts of improper fees from Harbor Compliance before kicking the Company out the door years before the loan's maturity date.

50.     The EOD Notice alleged defaults under Section 8.2(a) of the Loan Agreement for failure to comply with (i) a Total Leverage Ratio requirement under Section 6.10(a) of the Loan Agreement and (ii) certain bank account and account balance cap requirements under Section 6.6(a) of the Loan Agreement (collectively, the "Alleged Covenant Defaults").

51.     The EOD Notice came as a shock to Plaintiffs because, as described above, each of the Alleged Covenant Defaults either: (i) never existed in the first place, (ii) were otherwise modified or waived by CIBC in writing and/or (iii) are ones that CIBC was estopped from declaring and pursuing based on its own affirmative conduct and Plaintiffs' detrimental reliance.

52.    By the time the EOD Notice was sent, CIBC had already represented it was modifying or waiving the Total Leverage Ratio requirement and resetting the covenants for the remainder of 2022.  Plaintiffs relied upon these representations by CIBC.

53.    Also by the time CIBC sent the EOD Notice the Bank had already represented its agreement with Plaintiffs that the Loan Agreement expressly permitted the maintenance of external accounts at outside institutions, subject of course to delivery of appropriate Account Control Agreements.   Plaintiffs relied upon these representations by CIBC.

54.    Plaintiffs detrimentally relied on CIBC's representations and decisions related to Sections 6.6(a) and 6.10(a).  For example, had Plaintiffs known at any time between December 2021 and May 26, 2022 that CIBC was duplicitously intending to declare multiple events of default despite leading Plaintiffs to believe that the Loan Agreement was in good standing, Plaintiffs would have refinanced through a different bank with more integrity.  The lending market at that time was far more hospitable, with much lower interest rates, greater confidence in business acquisitions and higher corresponding business valuations, and many more options for refinancing under far superior terms.

55.    Also as it pertains to the Total Leverage Ratio in particular, had Plaintiffs known of CIBC's nefarious plan to reverse course and enforce the modified and/or waived requirements of Section 6.10(a), Plaintiffs would have proactively addressed expense cuts and other changes to the business much sooner so as to fit within the stated financial covenants.  Because the Total Leverage Ratio is calculated on a trailing 12 month basis, CIBC's conduct robbed Plaintiffs of the ability to stay in compliance and further ensured that Plaintiffs would stay in alleged default for an extended period of time.

56.    Although vehemently disagreeing with the Alleged Covenant Defaults for the reasons described above, Plaintiffs nonetheless appreciated the significance of the allegations being made and, as such, immediately began to address the situation with CIBC in a serious, good faith manner.

57.    To that end, Harbor Compliance reached out to Mr. Usher to discuss the EOD Notice.  In response, Mr. Usher attempted to hold the EOD Notice and the threat of accumulating default interest over Harbor Compliance to renegotiate the term of the Loan Agreement.

58.    Nonetheless, Harbor Compliance continued its good faith efforts to address the situation and satisfy CIBC's sudden demands regarding Harbor Compliance's Total Leverage Ratio and account transfers.  For example, Harbor Compliance cut expenses, and the jobs of many employees, including much of its sales team, and nearly its entire marketing department, in an effort to meet CIBC's demands as quickly as possible.  These efforts starved the Company of growth, thereby significantly impacting both the morale and the overall value of the Company.

59.    CIBC essentially forced Harbor Compliance to fundamentally change its operations and starve its business in order to satisfy the Bank's unreasonable demands.

60.    In a presentation shared with the bank in July of 2022, Plaintiffs again detailed how the Alleged Covenant Defaults were proximately caused by undefined or impossible covenant terms and grossly inaccurate revenue projections for Labyrinth as provided by the Seller.

61.    Subsequently, Plaintiffs worked in good faith to address and rectify each of the Alleged Covenant Defaults.  Despite providing several proposals squarely addressing CIBC's stated concerns, the Parties were not able to meaningfully resolve their issues.

62.    Specifically, Plaintiffs provided details related to Labyrinth's conversion to accrual accounting and how, after that conversion, the Total Leverage Ratio would be both capable of accurate calculation and otherwise met.

63.    And despite disagreeing with the Bank's new interpretation of Section 6.6(a), Plaintiffs were willing to move all of their external accounts (except for the two (2) accounts carved from Section 6.6(a)) to CIBC.

64.    Plaintiffs confirmed in writing to CIBC that they were ready, willing and able to address all the Alleged Covenant Defaults in a letter dated October 14, 2022.

65.    As noted in that letter, the main impediment in negotiations up to that point had been CIBC's insistence that the Loan Agreement be amended rather than permitting Plaintiffs to address the Alleged Covenant Defaults in the ways described above.

66.    Specifically, CIBC was using the existence and continuation of the Alleged Covenant Defaults to insist upon several amendments to the Loan Agreement including, most offensively, a significant shortening of the original October 4, 2026 Maturity Date by some 3.5 years, to March of 2023.

67.    Plaintiffs' October 14, 2022 proposal was not accepted by CIBC.  Instead, after receiving this proposal, the immediate response from Mr. Usher, stated on an all-hands call, was that, even if the Alleged Covenant Defaults were satisfactorily addressed, the Bank would not permit the Loan Agreement to be placed back into performing status and that CIBC would force Harbor Compliance to "litigate its way back into compliance."

68.    Extremely distressed and concerned about CIBC's strong-armed and improper negotiating tactics, Plaintiffs responded in a letter dated December 2, 2022.

69.     In that letter Plaintiffs outlined how the duty of good faith and fair dealing, along with other well-established contractual doctrines, precluded CIBC from taking the untenable position that Harbor Compliance would have to "litigate its way back into compliance" with the Loan Agreement.

70.     As further stated in that letter, Plaintiffs remained ready, willing and able to address each of the Alleged Covenant Defaults but, given CIBC's stated intention to prevent performance in that regard, Plaintiffs had no choice but to accede to CIBC's unreasonable demand for an amendment to the Loan Agreement.

71.     The Parties then proceeded to negotiate terms for an amendment during the month of December 2022 by exchanging multiple versions of term sheets meant to memorialize all material terms of the proposed amendment.

72.     To that end, and as but one example of the Parties envisioning the competing term sheets to include all material terms, CIBC's December 7, 2022 proposal contained the following prefatory language:

> *Below is the Bank's counterproposal for an Amendment to the Loan Agreement. Any/all Terms not addressed in the proposal below shall remain as currently written/contemplated in the existing Loan Agreement. The below proposed terms are non-binding and remain subject to definitive documentation to be agreed to by the parties.* (emphasis in original).

73.     Although CIBC made it appear as though they were negotiating toward an amendment over the next several weeks, what in actuality occurred was a continuation of the same flagrant bad faith and willful misconduct by the Bank that preceded and occasioned Plaintiffs' December 2, 2022 correspondence.

74.     As was the case in October, by mid to late December, there appeared to still be one main sticking point left to negotiate – the new Maturity Date demanded by the Bank.  CIBC was continuing to demand, as part of any amendment, a substantial shortening of the Maturity Date.

75.    The new Maturity Date was thoroughly discussed on two all-hands calls, the first on December 16, 2022 and the second on December 23, 2022.  In each of those calls Mr. Usher, on behalf of CIBC, noted that the other points contained in Plaintiffs' term sheet of December 12, 2022 (the "12.12.22 Term Sheet") were agreeable to the Bank, including a full waiver of default interest (subject to certain other requirements, as set forth in the 12.12.22 Term Sheet).   There were no terms outside of the 12.12.22 Term Sheet discussed, or so much as even mentioned, by Mr. Usher on those calls.  Mr. Usher promised to have an answer on the one remaining point, the revised Maturity Date, in the near future.

76.    Yet, for some reason, it took until January 19, 2023, or nearly 4 weeks, for the Bank to finally get back to Plaintiffs.  And rather than providing an answer on the one outstanding point, the new proposed Maturity Date, or sending a new term sheet version (as had been the Parties' negotiation practice up to that point), the Bank instead sent Plaintiffs a fully drafted "First Amendment to Loan and Security Agreement" (the "Proposed First Amendment").

77.    Shockingly, the Proposed First Amendment contained at least three (3) material terms never discussed during the parties' negotiations, contradicting CIBC's own words that "Any/all Terms not addressed shall remain as currently written/contemplated in the existing Loan Agreement."

78.    Like CIBC's demand for an extremely shortened Maturity Date, these new terms were entirely unrelated to the Alleged Covenant Defaults at hand, were entirely untenable for Plaintiffs, and served no conceivable purpose other than to cram through advantages for CIBC that are well beyond the scope of the negotiated Loan Agreement.

79.    The proposed new terms included, most offensively, (i) a substantially increased interest rate; (2) a $250,000 additional fee; and (3) the right to appoint a receiver, trustee, or similar official to take control of Plaintiffs' businesses.

80.    Equally as appalling, the Proposed First Amendment purported to capitalize and charge all alleged default interest, in clear contradiction to the Bank's representation (as communicated by Mr. Usher) that all such amounts would be waived as part of an amendment to the Loan Agreement.

81.    Obviously, Plaintiffs could never agree to these new, outrageous terms, meaning that, through no fault of Plaintiffs, the Bank's concerns related to Section 6.10(a) and Section 6.6(a) would not be addressed.

82.    Plaintiffs demanded that CIBC cease its willful duplicity, but the Bank refused.

83.    Although Plaintiffs remained up-to-date on their installment payments under the Loan Agreement, CIBC's Proposed First Amendment was designed to impose a devastating chokehold on Plaintiffs' ongoing ability to do so.

84.    Plaintiffs responded to the Bank's outrageous conduct through a letter dated February 15, 2023.

85.    Although the Bank's bad faith conduct was shocking and dismaying, Plaintiffs nonetheless attempted at that time to remain constructive in addressing the Alleged Covenant Defaults:

> *Despite all this, Harbor Compliance remains ready, willing and able to address the Alleged Covenant Defaults. But because of CIBC's documented bad faith, contemporaneous with Harbor Compliance addressing the Alleged Covenant Defaults, CIBC must: (i) execute a waiver of default; (ii) acknowledge and agree that the bank is waiving all fees and costs allegedly accrued (including all legal fees, financial fees and default interest); (iii) acknowledge and agree the bank will apply any payments made by Harbor Compliance to principal and regular interest,*

*only; and (iv) credit Harbor Compliance for the additional interest point spread going back to the date the audit was otherwise complete.* (emphasis in original).

86.     Wasting no time, the Bank responded the very next day, February 16, 2023, to characterize the proposal as "unserious".

87.     Despite issuing the EOD Notice in May of 2022 and despite continued letter writing wherein the Bank continues to assert the existence of the Alleged Covenant Defaults, at no time did CIBC actually charge or attempt to collect default interest under the Loan Agreement.  Instead, CIBC held the threat of default interest over Harbor Compliance's head throughout renegotiations, while continuously invoicing Harbor Compliance for regular principal and interest payments, only, under the Loan Agreement.

88.     For the entire life of the Loan Agreement Plaintiffs have timely and fully paid each monthly invoice and CIBC has applied those payments toward principal and interest, and not toward default interest.

89.     Since receiving the EOD Notice, Plaintiffs made every reasonable effort to provide CIBC with Account Control Agreements over Plaintiffs' external accounts.

90.     Nevertheless, CIBC willfully refused to accept the Account Control Agreements provided by Plaintiffs and, in so doing, actively barred Plaintiffs from addressing the Alleged Covenant Default of the bank account requirements set forth in Section 6.6(a) of the Loan Agreement.

91.     CIBC similarly interfered with Harbor Compliance's efforts to achieve compliance with the Total Leverage Ratio covenant. When negotiations with CIBC stalled due to the Bank's insistence that the loan was too risky to continue, Harbor Compliance offered to make a significant principal pay down of the loan to improve the Company's total leverage ratio.  This multimillion dollar payment was made by Harbor Compliance on March 8, 2023.

92. Despite receiving the benefit of a massive pay down, two months later on May 17, 2023 CIBC, in a further act of bad faith, accelerated the entire balance of the loan and demand payment in full of all unpaid obligations thereunder.

93. This was yet another bad faith strategy designed to intimidate and coerce Plaintiffs into signing an onerous amendment.

94. CIBC's strategy worked, and left with no choice, the Plaintiffs were coerced into signing the First Amendment to Loan and Security Agreement on May 26, 2023 (the "First Amendment").

95. The First Amendment recounts Plaintiffs' position that "[t]he Bank has materially breached the Loan Agreement and, among other things, violated the duty of good faith and fair dealing and engaged in other behavior included within the claims each defined as a Borrower Claim (as defined herein)."

96. Through the First Amendment, the Bank finally accepted the Account Control Agreements that had long been offered by Plaintiffs as being consistent with the requirements of the Loan Agreement, rather than insisting on transfer of funds to the Bank, and Section 6.6 of the Loan Agreement was modified to clarify and confirm the parties' mutual understanding.

97. But, through and on account of the First Amendment, the Bank extracted, among other things, the following from Plaintiffs: (1) multimillion dollar loan pay downs (the "Principal Pay Downs"); (2) a shortened maturity date, from October 4, 2026 to March 31, 2024; and (3) a so-called "Amendment Fee" of $200,000, which in actuality consisted of a $25,000 fee to CIBC and $175,000 for attorney's fees and expenses.

98. Plaintiffs agreed to pay the Amendment Fee because it was represented by the Bank in the First Amendment that CIBC "shall not seek any further costs and expenses beyond the

Amendment Fee on account of either (i) the Alleged Events of Default or (ii) any other costs or expenses existing on or before the First Amendment Effective Date."  Plaintiffs would not have agreed to pay any portion of the Amendment Fee without these promises by the Bank.

99.    After being unable to procure refinancing for an extended period of time due to CIBC's bad faith conduct described herein, Harbor Compliance was finally able to secure refinancing on the eve of the Loan Agreement's shortened maturity date of March 31, 2024. Because of a bank holiday in Canada, the closing for the refinance was ultimately scheduled for April 1, 2024 and the maturity date was extended to that date as well.

100.    Emboldened by their prior successful scheme to extort concessions and payments from Plaintiffs under duress and coercion as recounted above related to the Alleged Covenant Defaults and the First Amendment, on March 22, 2024, CIBC delivered a proposed payoff letter as a necessary condition precedent to refinancing of the loan (the "Payoff Letter").

101.    The Payoff Letter included improper and unreasonable charges, specifically for grossly excessive legal fees (collectively, the "Payoff Legal Fees").   These grossly excessive Payoff Legal Fees spanned the months of May 2023 (the same month the First Amendment was executed) all the way through January 2024.   CIBC did not present these alleged charges to Plaintiffs as they were being incurred; indeed the first mention of such charges came nearly a year after they were supposedly incurred.

102.    CIBC's demand for the grossly excessive Payoff Legal Fees breached at least two (2) different agreements: (1) the Loan Agreement (at Section 12.3) and (2) the First Amendment (at Section 14).  And CIBC's subsequent actions and omissions, as will be described below, breached a third agreement, (3) the Amended Payoff Letter.

103.    Immediately after receiving the outrageous demand for the Payoff Legal Fees, Plaintiffs objected, and demanded to receive both a justification for and also documented proof of the charges.

104.    In response, CIBC stated on March 22nd that the charges were allegedly "Bank Expenses" as that term is defined in the Loan Agreement, which "were incurred in connection to the transactions contemplated by the Loan Documents … ."  This was the first time that Plaintiffs received any sort of justification for the outrageous charges.  But, CIBC failed to provide any documentary proof supporting the demanded fees.

105.    Only after several follow-up requests from Plaintiffs for documentary proof did CIBC finally provide, on March 25, 2024 (less than one week before refinancing), a copy of the underlying legal invoices making up a vast majority of the Payoff Legal Fees (the "Legal Invoices").  As described earlier, the Legal Invoices spanned several months and straddled two separate years, from May of 2023 through January of 2024.

106.    It seems as though not only had CIBC not timely forwarded the Legal Invoices to Plaintiffs, *but CIBC had not even reviewed the Legal Invoices prior to demanding the Payoff of Legal Fees*.

107.    Indeed, on March 27th (4 days prior to the refinance), CIBC acknowledged that certain of the requested fees "related to the closing of the amendment" and that "[p]er our agreement in that (sic) amendment which included a flat fee to cover all associated legal expenses and bank fees", the charges from May of 2023 would be deducted from the Payoff Legal Fees, resulting in a net legal fee payoff amount of $68,475.10 (the "Amended Payoff Legal Fees"), as reflected in an amended payoff letter dated March 27, 2024 (the "Amended Payoff Letter").

108.    Beyond CIBC's concessions related to seeking fees in blatant violation of the First Amendment, the Legal Invoices clearly demonstrated that CIBC was seeking fees for which it had no right to be reimbursed.

109.    Specifically, the Legal Invoices contained several charges with descriptions related to the First Amendment and/or the Alleged Events of Default, charges which by the express terms of the First Amendment are not recoverable.

110.    Most of the astronomical sums demanded pertain to what was a garden variety response to a simple subpoena request.  The Legal Invoices show that the subpoena response was overstaffed, by over-qualified individuals, and the time spent (nearly 50 hours) was grossly excessive. Among other issues, it appears from the Legal Invoices that multiple attorneys were all performing the same or similar tasks, which is duplicative and unreasonable.  Additionally, very senior-level lawyers were handling more menial tasks such as the actual production of documents, which is an administrative (non-billable) task, or at worst one completed by a paralegal, not an attorney, and certainly not an attorney billing over $1,400 per hour.  A reasonable way to staff and respond to the subpoena would have been, as is very typical, to have a junior-level attorney along with a paralegal, at their respective rates, handle most of the matter with minimal senior-level attorney supervision.

111.    Moreover, the Legal Invoices, under "Summary of Expenses", show that, without any notice to or approval from Plaintiffs, CIBC decided to even hire a second law firm as part of the routine subpoena response exercise.  CIBC has never provided any documentary proof of these charges from the second firm (such as an invoice), and to this day Plaintiffs have no idea what, specifically, the charges include.

112. To make matters even worse, rather than sending the Legal Invoices on a regular basis as charges were incurred (which is both reasonable, and also required by the Loan Agreement), CIBC instead hid the charges as they mounted for the better part of a year, and even then only provided the invoices to Plaintiffs on the eve of the refinance closing, and only after Plaintiffs demanded to see them. Thus, it is clear that the Legal Invoices were not timely submitted to Plaintiffs for review and comment.

113. Additionally, and despite raising this issue repeatedly both in writing and verbally, CIBC has never adequately explained nor documented the basis for the astronomical amount of the Legal Invoices and instead held the payoff, and therefore Harbor Compliance refinancing, hostage to these grossly excessive and unreasonable charges.

114. Specifically, on March 28, 2024, Plaintiffs told CIBC that they had "serious problems with the reasonableness of many" of the entries on the Legal Invoices "as well as the timeliness of CIBC's request for indemnification" of same.

115. Accounting for the excessive time entries and the inordinate delay in presenting the Legal Invoices, Plaintiffs offered to pay a total of $21,000. CIBC rejected that offer.

116. Faced with no choice, on April 1, 2024 Plaintiffs delivered the full Cash Payoff Amount (as that term is defined in the Amended Payoff Letter) inclusive of the Amended Payoff Legal Fees. Immediately before doing so, Plaintiffs reiterated their objections; noted that the Cash Payoff Amount was not be delivered "voluntarily, but rather under protest as the result of coercion and duress by CIBC"; further noted that Plaintiffs disputed "the legality of CIBC's demand for the Cash Payoff Amount"; attached a copy of their prior March 28th dispute; and reserved all rights at law and in equity, waiving none.

117.    Despite the objections made by Plaintiffs, CIBC did not relent and instead coerced Plaintiffs into paying the vast majority of these unreasonable legal expenses and costs as an express condition of the refinance.  Thus, CIBC coerced these payments under duress.

118.    As will be detailed in the counts below, CIBC's coercive conduct demanding payment for outrageous, unreasonable, untimely and undocumented fees breached several sections of the operative contractual documents between the parties, including under the Loan Agreement and the First Amendment.

119.    CIBC's coercion also constituted gross negligence and willful misconduct, which claims are expressly excluded from claims released under the Amended Payoff Letter, and are therefore preserved.

120.    CIBC's breaches continued after the refinancing.  Although the Amended Payoff Letter required CIBC to perform various material tasks upon receipt of the Cash Payoff Amount, CIBC failed to perform many of these tasks.  For example, the Amended Payoff Letter required CIBC to "promptly deliver any possessory Collateral in its possession" to Plaintiffs.  One item of Collateral that CIBC possessed during the term of the loan was an original share certificate for all of the issued shares of Labyrinth (the "Share Certificate").  Notwithstanding CIBC's obligation to "promptly deliver" the Share Certificate to Plaintiffs upon receipt the Cash Payment Amount, the Bank failed to do so.

121.    In fact, the Bank took no steps to deliver the Share Certificate to Plaintiffs until July 2024 – three months after it had received the Cash Payment Amount – and even then only *after* Plaintiffs demanded the return of same.

122.    Similarly, although the Amended Payoff Letter required CIBC to "execute and deliver" "account control agreement terminations" and despite the fact that a portion of the

Amended Payoff Legal Fees received under duress by the Bank were earmarked for filing these terminations, CIBC entirely neglected to file the terminations for the Account Control Agreements. Indeed, CIBC only filed the terminations *after* Plaintiffs notified CIBC on April 11, 2024 that the documents had not been filed.

123.    The conduct detailed herein has caused Plaintiffs significant damages.  These damages exceed $550,000, and include: (i) the Amendment Fee of $200,000; (ii) the Amended Payoff Legal Fees of $68,475.10 ; and (iii) reasonable attorney's fees and other actual documented costs and expenses incurred (recoverable in accordance with Section 12.11 of the Loan Agreement), which are projected at this time for this case to be a minimum of $300,000.

## COUNT I
## DECLARATORY JUDGMENT

124.    The foregoing paragraphs are hereby incorporated by reference as if set forth herein in full.

125.    A present and distinct controversy exists between Plaintiffs and CIBC concerning the obligations and performance of the parties under the terms of the Loan Agreement, the First Amendment and the Amended Payoff Letter.  These controversies are ripe for declaratory judgment and adjudication by this Court.

126.    There is no adequate remedy at law as to the obligations and performance of the parties under the terms of the Loan Agreement, the First Amendment or the Amended Payoff Letter.

127.    Plaintiffs are entitled to a binding and judicial declaration affirming:

   a.  The Loan Agreement is valid and enforceable;

   b.  Plaintiffs have performed all material obligations under the Loan Agreement;

c. CIBC is in material breach of the Loan Agreement as a result of the conduct described herein;

d. Plaintiffs have performed all material obligations under the First Amendment;

e. CIBC is in material breach of the First Amendment as a result of the conduct described herein;

f. The Amended Payoff Letter was procured by coercion and is voidable by duress and/or the releases contained therein are unenforceable as against Plaintiffs;

g. In the alternative, Plaintiffs are entitled to rescind the releases granted in the Amended Payoff Letter;

h. In the alternative, Plaintiffs have performed all material obligations under the Amended Payoff Letter, and CIBC is in material breach of the Amended Payoff Letter as a result of the conduct described herein;

i. CIBC has engaged in gross negligence and willful misconduct;

j. Plaintiffs are entitled to all rights and benefits under the Loan Agreement, the First Amendment and the Amended Payoff Letter; and

k. Plaintiffs are entitled to recovery of their reasonable attorney's fees, costs and expenses incurred.

## <u>COUNT II</u>
## BREACH OF CONTRACT – THE LOAN AGREEMENT AND FIRST AMENDMENT

128. The foregoing paragraphs are hereby incorporated by reference as if set forth herein in full.

129. The Loan Agreement is a valid and enforceable contract between Plaintiffs and CIBC.

130.    Plaintiffs have performed in accordance with the terms of the Loan Agreement and are entitled to receive the benefits therefrom.

131.    CIBC materially breached the terms of the Loan Agreement by, *inter alia*, by demanding the repayment and indemnification of attorney's fees under Section 12.3 of the Loan Agreement despite such fees (i) not constituting "Bank Expenses"; (ii) not being incurred as a result of, following from, consequential to, or arising from transactions among Bank and Plaintiffs (but rather a subpoena response between Bank and a third-party); (iii) not being reasonable or documented; and (iv) being directly caused by the gross negligence and willful misconduct of CIBC.

132.    The right to pursue these material breaches were maintained by Plaintiffs as some of their "Retained Rights" as identified in the First Amendment.

133.    These material breaches preclude CIBC from otherwise enforcing the terms of the Loan Agreement, and likewise excuse any alleged nonperformance by Plaintiffs.

134.    Alternatively, CIBC is estopped from asserting or has otherwise waived the right to assert a claim to indemnification under the Loan Agreement due to the extensive delay in presenting such charges to Plaintiffs.

135.    Plaintiffs have fully performed in accordance with the terms of the First Amendment and are entitled to receive the benefits therefrom.

136.    CIBC materially breached Section 14 of the First Amendment by coercing Plaintiffs to execute the Amended Payoff Letter and to pay additional legal fees and expenses that were not on account of the Alleged Events of Default (as that term is defined in the First Amendment).

137.    CIBC also materially breached Section 14 of the First Amendment by seeking cost and expenses existing on or before the First Amendment Date.

138.    The right to pursue these material breaches were maintained by Plaintiffs as some of their "Retained Rights" as identified in the First Amendment, and also consistent with Section 11(a)(ii) of the First Amendment.

139.    These material breaches preclude CIBC from otherwise enforcing the terms of the First Amendment, and likewise excuse any alleged nonperformance by Plaintiffs.

140.    All of these breaches by CIBC of the Loan Agreement and the First Amendment were willful and fundamental breaches.

141.    As a direct and proximate result of CIBC's willful and fundamental breaches of the Loan Agreement and the First Amendment, Plaintiffs have suffered and will continue to suffer damages, including the Amendment Fee of $200,000, the Amended Payoff Legal Fees of $68,475.10 and reasonable attorney's fees and other actual documented costs and expenses incurred (in accordance with Section 12.11 of the Loan Agreement), which are projected at this time for this case to be a minimum of $300,000.

142.    Plaintiffs further seek to rescind the effectiveness of the First Amendment due to (i) the aforementioned material breaches by CIBC, as well as (ii) the Bank's duress and coercion of Plaintiffs as described herein.

**<u>COUNT III</u>**
**BREACH OF CONTRACT – THE AMENDED PAYOFF LETTER**

143.    The foregoing paragraphs are hereby incorporated by reference as if set forth herein in full.

144.    Plaintiffs have performed in accordance with the terms of the Amended Payoff Letter and are entitled to receive the benefits therefrom.

145.    CIBC coerced Plaintiffs to execute the Amended Payoff Letter under duress by holding the refinance hostage to the payment of unreasonable, undocumented and outrageous charges, each of which were uncollectable under the Loan Agreement.

146.    CIBC materially breached the Amended Payoff Letter by, *inter alia*, (i) failing to promptly deliver the Share Certificate and (ii) failing to execute and deliver account control agreement terminations.

147.    The right to pursue these claims for duress and for CIBC's material breaches were maintained by Plaintiffs as some of their "Retained Rights" as identified in the First Amendment, and also consistent with the Amended Payoff Letter agreement that the release granted therein shall not extend to claims arising (i) out of events, facts or circumstances not in existence on prior to the payoff date of April 1, 2024; and (ii) out of the gross negligence or willful misconduct of CIBC or material breaches by CIBC of its obligations under the Amended Payoff Letter.

148.    Plaintiffs further seek to rescind the effectiveness of the Amended Payoff Letter or, at minimum, the release contained therein, due to: (i) the aforementioned material breaches by CIBC; and (ii) the Bank's duress and coercion of Plaintiffs as described herein.

**WHEREFORE**, Plaintiffs, Harbor Business Compliance Corporation and Labyrinth, Inc., respectfully request that this Honorable Court enter judgment in their favor against Defendant, Canadian Imperial Bank of Commerce, in connection with each of the foregoing causes of action, and Order the following relief:

A.    That the Amended Payoff Letter, and the release contained therein, be rescinded;

B.    That Plaintiffs be awarded actual, compensatory, and consequential damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses for

Defendant's separate and distinct material breaches of the Loan Agreement, the First Amendment and the Amended Payoff Letter; and

C.      That Plaintiffs be awarded such other and further necessary relief as this Court may deem just and proper.

Respectfully submitted,

**ROYER COOPER COHEN BRAUNFELD LLC**

Dated: August 2, 2024                    By: */s/ Barry L. Cohen* _____
                                         Barry L. Cohen
                                         1120 Avenue of the Americas, 4th Floor
                                         New York, NY 10036
                                         212-389-5947 (phone)
                                         484-362-2630 (fax)
                                         BCohen@rccblaw.com

                                         Matthew Faranda-Diedrich
                                         Hope Steidle Kildea
                                         Two Logan Square
                                         100 N. 18th Street, Suite 710
                                         Philadelphia, PA 19103
                                         267-546-0275 (phone)
                                         484-362-2630 (fax)
                                         mfd@rccblaw.com
                                         HSteidleKildea@rccblaw.com

                                         (*Pro Hac Vice applications forthcoming*)

                                         *Attorneys for Plaintiffs, Harbor Business*
                                         *Compliance Corporation and Labyrinth, Inc.*